## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

NATIONAL ASSOCIATION OF INDUSTRIAL
BANKERS, AMERICAN FINANCIAL SERVICES
ASSOCIATION, and AMERICAN FINTECH COUNCIL,

        Plaintiffs,

v.

PHILIP J. WEISER, Attorney General of the State of
Colorado, and MARTHA FULFORD, Administrator of the
Colorado Uniform Consumer Credit Code,

        Defendants.

Civil Action No. 1:24-cv-00812

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    Plaintiffs National Association of Industrial Bankers (NAIB), American Financial

Services Association (AFSA), and American Fintech Council (AFC) bring this suit on behalf of

their members for declaratory judgment and injunctive relief against Philip J. Weiser, Attorney

General of the State of Colorado, and Martha Fulford, Administrator of the Colorado Uniform

Consumer Credit Code (UCCC), in their official capacities. Plaintiffs challenge Section 3 of

H.B. 23-1229, 74th Gen. Assemb., Reg. Sess. (Colo. 2023), which became law on June 5, 2023,

is codified at Colo. Rev. Stat. § 5-13-106, and will take effect on July 1, 2024.

2.    Section 3 attempts to opt Colorado out of Section 521 of the Depository Institutions

Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub. L. No. 96-221, 94 Stat. 132,

164-65 (1980). DIDMCA Section 521 provides that a state-chartered bank may lend nationwide

at rates up to the higher of (i) its home state's interest-rate caps, or (ii) a federal interest-rate cap

(one percent above a specific Federal Reserve discount rate). Congress authorized states to opt out

of DIDMCA Section 521—meaning that the opting-out state could continue to impose its own interest-rate caps—but it limited that opt-out right to loans "made in" the opting-out state. DIDMCA § 525, 94 Stat. 167. Under federal law, a loan is only "made in" a state *other than* the state where a bank is chartered when all the key functions associated with originating the loan—including the bank's decision to lend, communication of the loan approval decision, and disbursal of loan proceeds—occur in that other state.

3.      In enacting its opt out, Colorado far exceeded the authority Congress granted it under DIDMCA. Ignoring the federal definition of where a loan is deemed to be "made," Colorado seeks to impose its state interest-rate caps on *any* "consumer credit transaction[] in" Colorado. HB 23-1229 § 3. Colorado defines this to include, among other things, any loan to a Colorado consumer by any state-chartered bank that advertises on the internet in Colorado. This does not satisfy the functional, federal definition of where a loan is "made."

4.      Colorado's law is invalid on its face. *First*, Colorado's opt out is preempted by DIDMCA and violates the Supremacy Clause of the United States Constitution by attempting to expand the federally granted opt-out right to loans not actually "made in" Colorado under federal law. *Second*, the opt out violates the Commerce Clause because it will impede the flow of interstate commerce and subject state-chartered banks to inconsistent obligations across different states, creating a significant burden on interstate commerce.

5.      Nor will the opt out even accomplish Colorado's stated goals. Colorado promoted the opt out as part of its all-fronts war against predatory, payday-style lending. But the law is an ill fit for that aim. Plaintiffs' members are not payday lenders. To the contrary, they offer a wide variety of useful, familiar, everyday credit products—like personal installment loans, store-brand credit cards, and installment loans offered by retailers at "point of sale" to fund single larger-cost

consumer purchases, often called "buy now, pay later" (BNPL) loans. These products are provided at a range of rate and fee options, which sometimes—to account for credit risk—are above Colorado's rate and fee caps, but within the rate caps allowed by DIDMCA. Colorado's opt out will prevent Plaintiffs' members from offering these mainstream products to many Colorado consumers.

6.     Yet at the same time, national banks will still offer these very same loan products to Colorado residents at interest rates in excess of Colorado's interest-rate and fee caps. That is because the National Bank Act (NBA), like DIDMCA, shields national banks from state interest-rate caps. But unlike DIDMCA, the NBA does not permit states to opt out.

7.     The net result is that Coloradans will continue to be offered the same products at interest rates above Colorado's rate caps but will have far less choice in what products they can select. State-chartered banks, including Plaintiffs' members, will no longer find it economically practicable to lend to many Colorado residents. Meanwhile, the consolidation of the Colorado consumer credit market into national banks will reduce competition and inevitably lead to higher rates. Shrinking credit availability combined with rising rates will most acutely affect Colorado consumers who, because of their credit risk profiles or thin credit history, have less access to credit generally. Perversely, these are the very consumers Colorado insists it is trying to protect with the opt out.

8.     This Court should enter judgment declaring that Section 3 is void with respect to loans not "made in" Colorado as defined by applicable federal law and enjoin Colorado from taking any action to enforce or give effect to Section 3 with respect to those loans.

**PARTIES**

9.     Plaintiff NAIB is a Utah-based trade association representing industrial loan companies (ILCs). ILCs, or industrial banks, have been an integral part of the U.S. financial system

for over a century, providing critical access to credit opportunities for those traditionally underserved by large national financial institutions. NAIB champions innovative financial services for Americans by expanding access to credit, guaranteeing consumer choice, and providing unique banking services. A list of NAIB's members is available at https://www.industrialbankers.org/about. NAIB members include ILCs chartered by states other than Colorado that offer a wide variety of useful, familiar, consumer credit products to Colorado consumers, either directly or via partner platforms, including retailers, manufacturers, finance companies, software as a service (SaaS) providers, and financial technology (Fintech) companies. These products include, for example, personal installment loans, BNPL loans to fund single purchases at the point of sale, and store-brand credit cards. While NAIB's members offer these products at a range of rate and fee options, they sometimes include interest rates or finance charges higher than those allowed under Colorado's interest-rate caps but legal in those institutions' home states.

10.     Founded in 1916, Plaintiff AFSA is the primary trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment loans, direct and indirect vehicle financing, mortgages, payment cards, and credit for non-vehicle retail purchases. AFSA members do not offer payday or vehicle title loans. AFSA's mission is to promote safe, ethical lending to responsible, informed borrowers and to improve and protect consumers' access to credit. AFSA's members include a variety of state-chartered and national banks, as well as many non-bank state-licensed financial institutions. AFSA believes in and supports competition among various types of financial institutions, and its members include state banks chartered in states other than Colorado that offer credit cards and a variety of other financial products to Colorado consumers—sometimes at rates higher than those allowed under Colorado's interest-rate caps but

legal in those institutions' home states. A list of AFSA's Board of Directors is available at https://afsaonline.org/about-afsa/leadership/.

11.     A standards-based organization, Plaintiff AFC is the premier trade association representing the largest Fintech companies and innovative banking-as-a-service (BaaS) banks. AFC's mission is to promote a transparent, inclusive, and customer-centric financial system by supporting responsible innovation in financial services and encouraging sound public policy. AFC members foster competition in consumer finance and pioneer products to better serve underserved consumer segments and geographies. AFC's members lower the cost of financial transactions, allowing them to help meet demand for high-quality, affordable products. Like Plaintiffs NAIB and AFSA, AFC's members include state-chartered depository institutions (chartered by states other than Colorado) that make loans to Colorado consumers, sometimes at rates higher than those allowed under Colorado's interest-rate caps. A list of AFC's members is available at https://fintechcouncil.org/who-we-are#Members.

12.     Plaintiffs' members are not so-called "payday" lenders. *See* AFSA, About AFSA, https://afsaonline.org/about-afsa/ (last visited Mar. 23, 2024); AFC, Membership Standards, https://fintechcouncil.org/what-we-do (last visited Mar. 23, 2024); NAIB, Industrial Bank Members, https://www.industrialbankers.org/about (last visited Mar. 23, 2024). They do not offer high-cost, short-term, small-dollar loans at exorbitant rates—the sort of loans Colorado has claimed it is trying to target with the opt out.

13.     If it becomes effective, Colorado's purported opt out of DIDMCA Section 521 will apply Colorado interest-rate and fee laws to loans that NAIB, AFSA and AFC members extend to Colorado consumers even though those loans are, as a matter of federal law, not "made in" Colorado but rather are "made in" the lenders' home states. Plaintiffs' members are already

expending considerable resources and incurring unrecoverable costs to prepare to comply with Colorado's opt out. If the opt out goes into effect during this litigation, they will also: (i) irreparably lose revenue as a direct result of needing to lower interest rates and late fees; (ii) lose both revenue and goodwill through strained or lost relationships with customers (to whom they may need to cease lending), retailers (for which they offer store cards or point-of-sale financing), and other strategic partners; (iii) lose opportunities for new customer, retailer and partner relationships, including losing customers, retailers and partners to national banks; (iv) incur ongoing compliance costs; and (v) risk consumer lawsuits and Colorado enforcement actions.

14. Declaring HB 23-1229 Section 3 to be unlawful and void, and enjoining its application with respect to loans that are not "made in" Colorado under federal law, would avoid these harms.

15. Plaintiffs have associational standing to challenge Section 3 because (1) some of their members have individual standing to sue in their own right, as those members are subject to Section 3; (2) challenging Section 3 is germane to Plaintiffs' organizational purposes; and (3) members' individual participation is unnecessary in this facial challenge, which presents a question of law. *See Citizens for Const. Integrity v. United States*, 57 F.4th 750, 759 (10th Cir. 2023).

16. Defendant Philip J. Weiser is the Attorney General of the State of Colorado. Defendant Weiser is responsible for designating an assistant attorney general to serve as a UCCC Administrator, who enforces the UCCC. *See* Colo. Rev. Stat. §§ 5-6-103, 5-6-111, 5-6-114. He is sued in his official capacity.

17. Defendant Martha Fulford is the UCCC Administrator charged with enforcing the UCCC, including bringing "civil action[s] to restrain a person from violating … [the UCCC] or

rules or regulations promulgated thereunder and for other appropriate relief." Colo. Rev. Stat. § 5-6-111. She is sued in her official capacity.

## JURISDICTION AND VENUE

18.     This action arises under the Commerce Clause, art. I, § 8, cl. 3, and Supremacy Clause, art. VI, cl. 2, of the U.S. Constitution, as well as under DIDMCA Sections 521 and 525. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and federal law.

19.     This lawsuit presents an actual case or controversy within the Court's jurisdiction, and the Court has authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, to decide this dispute and award relief.

20.     This Court has personal jurisdiction over defendants because they reside in and perform their official duties in Colorado. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) & (2) for the same reasons, and because Plaintiffs and their members will suffer the injuries giving rise to this action in this District.

## BACKGROUND AND LEGAL PRINCIPLES

**A.      DIDMCA**

**1.      Federal law preempts state interest-rate caps for national banks**

21.     Banks in the United States may choose to be chartered and regulated either by a state or by the federal government. This "dual-banking" system "has been a hallmark of banking in the United States for nearly 200 years." Office of the Comptroller of the Currency (OCC), *National Banks and The Dual Banking System*, at 1 (Sept. 2003), https://tinyurl.com/bdew3pzv. The current system traces back to the enactment of the NBA in 1864. *See Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10-11 (2007). Whereas state banks are regulated both by the federal government and the state in which they are chartered, under the NBA federally chartered banks

(*i.e.*, national banks) generally are "governed by Federal standards administered by … the [OCC]—and not by state authority." OCC, Final Rule Regarding Office of Thrift Supervision Integration & Dodd-Frank Act Implementation, 76 Fed. Reg. 43,549, 43,554 (2011).

22.     The NBA specifically preempts many state consumer protection laws from applying to national banks. As relevant here, NBA Section 85 provides that national banks may charge "interest at the rate allowed by the laws of the State … where the bank is located, or at a rate [1% higher than the federal discount rate], whichever [is] … greater." 12 U.S.C. § 85.

23.     In 1978, the Supreme Court unanimously held that NBA Section 85 allows a national bank to "export" the interest rates permitted in the state where the national bank is "located" when making loans to consumers who reside in other states. In that case, a national bank headquartered in Nebraska was permitted to make credit card loans to residents of Minnesota without regard to Minnesota's interest-rate limits. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 311-12 (1978).

24.     In determining that First of Omaha was entitled to NBA preemption because it was "located" in Nebraska, the Supreme Court first noted that the bank itself was located where it was chartered, in Nebraska. *Id.* at 309. The Court then took a more contextual approach to addressing the specific credit card program at issue. The Court held that even though the borrowers were Minnesota residents, (i) credit was "extended … in Nebraska," (ii) "[f]inance charges … [we]re assessed by the bank in Omaha," (iii) "payments … [we]re remitted to the bank in Omaha," (iv) credit cards were "issue[d] … in Omaha," and (v) "credit assessments" prior to card issuance were made in Omaha. *Id.* at 311-12. Under those circumstances, applying Nebraska law made sense, the Supreme Court explained, because "Minnesota residents were always free to visit

Nebraska and receive loans in that State" and "[i]t has not been suggested that Minnesota usury laws would apply to such transactions." *Id.* at 310-11.

25.     NBA Section 85 preemption as articulated in *Marquette* extends beyond "numerical" interest rates to other fees and charges, such as late fees. *See Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740, 745-47 (1996).

26.     Thus, under NBA Section 85, interest-rate limits and fee restrictions contained in Colorado's laws do not apply to loans issued by national banks that are not chartered in Colorado. A loan issued by a national bank located in Delaware, for example, must comply with NBA Section 85 (and thus with the higher of Delaware's interest-rate limits and 1% more than the federal discount rate), but not with Colorado's limits on interest rates.

### 2.     DIDMCA extends preemption of state interest-rate limits to state-chartered banks

27.     Shortly after *Marquette* confirmed that national banks could export their home-state interest rates nationwide, without regard to other states' interest rate cap laws, Congress chose to put state-chartered banks on an equal footing with national banks.

28.     The late 1970s saw soaring inflation, and to combat this the Federal Reserve pumped up interest rates, *see* 125 Cong. Rec. 30655 (1979)—just like the Fed is doing now. But while national banks could, under NBA Section 85, lend at rates up to the higher of (i) 1% above that increased federal discount rate, or (ii) the maximum interest rate allowed by their home state, "state lending institutions were constrained in the interest they could charge by [their home-state] state usury laws which often made loans economically unfeasible." *Greenwood Tr. Co. v. Commonwealth of Mass.*, 971 F.2d 818, 826 (1st Cir. 1992); *see also* Fed. Deposit Ins. Corp. (FDIC), Final Rule Regarding Federal Interest Rate Authority, 85 Fed. Reg. 44,146, 44,147 (July 22, 2020).

29.     State interest-rate limits had not significantly constrained state banks' lending activities before the 1970s; but when faced with these high Federal Reserve-imposed rates, state-chartered banks in states with low interest-rate caps saw their own cost of borrowing become higher than the state interest-rate limits, thus preventing those banks from profitably offering consumer credit. State banks thus found themselves "at a distinct competitive disadvantage with national banks" operating alongside them. 126 Cong. Rec. 6907 (1980) (Statement of Sen. Bumpers). Under increasing pressure, state banks restricted credit availability to consumers in those states, and funds flowed out of those state banks. *See id.*; *Usury Lending Limits: Hearing on S. 1988 Before the Comm. on Banking, Hous., & Urb. Affs.*, 96 Cong. 1 ( 1979) (hereinafter *Usury Lending Limits*) (Statement of Sen. Proxmire); 125 Cong. Rec. 30655 (1979) (Statements of Sens. Pryor & Bumpers).

30.     Consumers located in the affected states—and in particular consumers living in rural areas, often served only by state banks—saw their sources of credit dry up. *See* 126 Cong. Rec. 7070-71 (1980) (Statement of Sen. Proxmire) (discussing "loan money drying up in some States and funds just flowing out of the State" due to interest-rate limits); 126 Cong. Rec. 6907 (1980) (Statement of Sen. Bumpers) (discussing "concentration of capital in urban areas"); *Usury Lending Limits*, 96 Cong. 2-3 (Statement of Gov. Bill Clinton).

31.     By passing DIDMCA, Congress threw a line to state-chartered banks. DIDMCA contained an array of amendments affecting the United States financial system, but, as relevant to this lawsuit, Section 521 of DIDMCA amended the Federal Deposit Insurance Act "to prevent discrimination against State-chartered insured depository institutions," 12 U.S.C. § 1831d(a), by authorizing state-chartered banks to lend at rates up to the same levels as national banks.

32. Section 521, like NBA Section 85 for national banks, expressly "preempt[s]" "any State constitution or statute" that would interfere with a state-chartered federally insured bank's ability to "charge … interest" at the "greater" of (1) the federal rate ("not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank … is located"); or (2) "the rate allowed by the laws of the State, territory, or district where the bank is located." 12 U.S.C. § 1831d(a).

33. In other words, Section 521 permits state-chartered banks to lend at rates up to the higher of the federal cap or their "home" state's rate cap—without regard to the restrictive interest rate cap laws that were constraining them in their own home states.[1]

34. DIDMCA preemption, like Section 85 preemption for national banks, also applies to other fees and charges, such as late fees. *See Greenwood Tr.*, 971 F.2d at 831.

### 3. DIDMCA allows states to opt out of preemption for loans "made in" the opting-out state

35. Given Congress's concern that DIDMCA preemption could encroach on a state's authority to regulate interest rates *for banks chartered by that state*, Congress added Section 525 to DIDMCA, which allowed states to "opt out" of the interest-rate preemption provisions in Sections 521 through 523 for loans "made in" the opting-out state. *See* 126 Cong. Rec. 7070 (1980) (Statement of Sen. Proxmire); *see also Usury Lending Limits*, 96 Cong. 47-49 (discussing states' rights). The Section 525 opt out thus allowed states to reject Congress's lifeline to their own state banks if they chose. *Cf.* 126 Cong. Rec. 7070 (1980) (Statement of Sen. Proxmire) (discussing ability of states to reimpose interest rate cap laws).

---

[1] DIDMCA Sections 522 and 523 similarly preempted state interest rate cap laws with respect to state-chartered savings and loan associations and credit unions. *See* 94 Stat. 165-66.

36.     Specifically, Section 525 of DIDMCA provides:

> The amendments made by sections 521 through 523 of this title shall apply only with respect to loans made in any State during the period beginning on April 1, 1980, and ending on the date … on which such State adopts a law … which states explicitly and by its terms that such State does not want the amendments made by such sections to apply with respect to loans made in such State[.]

DIDMCA § 525, 94 Stat. 167.

37.     Section 525 does not specifically define the term "made in such State[.]" It also does not provide that the meaning of "made in" should be interpreted by reference to state law. *See* ¶¶ 53-55, *infra*.

38.     The legislative history of DIDMCA confirms that the opt-out was designed to allow states to restore their pre-DIDMCA ability to restrict *their own in-state banks* from lending above their own state interest-rate limits, without regard for the federal rate. There is no suggestion in the legislative history of Section 525 that Congress intended to allow states to restrict the interest rates that *out-of-state banks* physically operating outside a state could charge when lending "into" an opting-out state (the rate exportation issue addressed in *Marquette*). *See, e.g.*, 125 Cong. Rec. 30655 (1979) (Statements of Sens. Pryor and Bumpers) (explaining the goal of DIDMCA preemption was to rescue state-chartered banks that could not compete within their own states against national banks in a high rate environment); 126 Cong. Rec. 6906-07 (1980) (Statements of Sens. Proxmire and Bumpers) (explaining that the opt out would allow states to nonetheless retain control over their own state banks, and that DIDMCA preemption will allow for competitive equality between state-chartered and nationally-chartered banks); 126 Cong. Rec. 7070-71 (1980) (Statement of Sen. Proxmire) (explaining that "[t]he States retain authority to define the power of State-chartered banks[,]" and DIDMCA meets the needs of the national economy by enabling state banks to make loans in a high interest-rate environment).

39.     Pre-DIDMCA, state banks were not yet engaged in widespread national credit card lending like the national banks (the primary form of "rate exportation" in the 1970s); thus, this was not Congress's concern. Rather, Congress's concern when enacting DIDMCA was allowing state banks to escape their own states' interest-rate limits by relying on the federal rate; and its concern when enacting the opt-out was to restore to the states (if they wished) the right to address the inflation-induced interest-rate squeeze on their own state-chartered banks—not to restrict rate exportation by out-of-state state-chartered banks.

### 4.     After DIDMCA, some states opted out of, and then back in to, DIDMCA preemption

40.     Shortly after Congress enacted DIDMCA, seven states, including Colorado, plus one U.S. territory (Puerto Rico) invoked Section 525 to opt out of DIDMCA Sections 521 through 523 preemption. *See* 1981 Colo. Sess. Laws, ch. 73, § 1 (previously codified at Colo. Rev. Stat. § 5-13-104 (1993)) (original Colorado DIDA opt-out); *see also* 1980 Iowa Acts, ch. 1156, § 32; 1981 Me. Laws, ch. 218; 1981 Mass. Acts, ch. 231; 1982 Neb. Laws, LB 623, § 2; 1983 N.C. Sess. Laws, ch. 126, § 1; P.R. Laws, tit. 10, § 998l (adopted in 1980); 1981 Wis. Laws, ch. 45, § 50.

41.     However, as inflation continued to rage into the 1980s, six of the DIDMCA opt-out states—including Colorado—thereafter rescinded their opt-outs and opted back into DIDMCA. *See, e.g.*, 1994 Colo. Sess. Laws, ch. 272, § 12 (repealing original DIDMCA opt-out).

### B.     Colorado's interest-rate caps

42.     Colorado's UCCC governs consumer credit transactions in Colorado. Colo. Rev. Stat. § 5-1-201. Consumer credit transactions include various consumer loan products, such as personal loans and certain credit cards. See *id*. § 5-1-301(12), (15)(a).

43.     Colorado's laws weave a complex web of interest-rate restrictions ranging from 8% to 45%, depending on the nature of the transaction, the type of loan, and the amount. *See* Colo.

Rev. Stat. §§ 5-2-201, 5-12-102. For example, for store-brand credit cards, lenders may not charge in excess of 21%. Colo. Rev. Stat. § 5-2-201(3)(a). For most other loan products—including certain personal installment loans—lenders may not charge in excess of the greater of either (i) 21% *or* (ii) the total of 36% on the portion of the balance that is $1,000 or less, 21% on the portion of the balance that is more than $1,000 but does not exceed $3,000, and 15% on the balance that is more than $3,000. Colo. Rev. Stat. § 5-2-201(2)(a). The UCCC also limits a number of bank fees, including capping late fees for certain loans at $15. *See id.* §§ 5-2-202, 5-2-203, 5-2-212.

44.     Under the UCCC, a consumer credit transaction is "made in" Colorado, and thus covered by the UCCC, if either "(a) A written agreement evidencing the obligation or offer of the consumer is received by the creditor in this state"[2]; or "(b) A consumer who is a resident of this state enters into the transaction with a creditor who has solicited or advertised in this state by any means, including but not limited to mail, brochure, telephone, print, radio, television, internet, or any other electronic means." Colo. Rev. Stat. § 5-1-201(1)(a)-(b).[3]

45.     Colorado has moved aggressively in recent years to combat lending the state considers to be predatory, focusing on so-called "payday" and "alternative charge" high-cost, small-dollar, short-term loans. In 2018, Colorado passed Proposition 111, which amended the UCCC to limit interest rates and fees on so-called "payday" loans to 36 percent. *See* Colo. Rev.

---

[2] Pursuant to Colo. Rev. Stat. § 5-1-201(10), "received" means "obtained as a result of physical delivery, transmission, or communication to one who has actual or apparent authority to act for the creditor in this state whether or not approval, acceptance, or ratification by any other agent or representative of such creditor in some other state is necessary to give legal consequence to the consumer credit transaction."

[3] Colo. Rev. Stat. § 5-1-201(2) clarifies that "[n]otwithstanding paragraph (b) of subsection (1) of this section, unless made subject to this code by agreement of the parties, a consumer credit transaction is not made in this state if a resident of this state enters into the transaction while physically present in another state."

Stat. § 5-3.1-101.5. Colorado has also brought a series of enforcement actions against lenders, alleging violations of Colorado's limits on rates and fees.

### C.      Colorado HB 23-1229 Section 3

#### 1.      Colorado reenacts its DIDMCA opt-out

46.      On June 5, 2023, Colorado enacted HB 23-1229. It will in relevant part take effect on July 1, 2024. *See* HB 23-1229 § 6(4).

47.      Colorado promoted the law as part of its efforts to address predatory lending, and HB 23-1229 does include a provision intended to curb so-called "alternative charge loans," a form of high-cost, small dollar loans not covered by Colorado's 2018 payday loan legislation. HB 23-1229 § 2 (amending Colo. Rev. Stat. § 5-2-214).

48.      Central to this lawsuit, however, is that Section 3 of HB 23-1229 includes a renewed DIDMCA opt-out provision. The bill's sponsors characterized this provision, too, as part of Colorado's push to combat high-cost, small dollar lending. *See Concerning changes to consumer lending laws to limit charges to consumers: Hearing on HB 23-1229 before H. Fin. Comm.*, 2023 Leg., 73rd Sess. (Colo. 2023) (Statements of Reps. Javier Mabrey and Mike Weissman), https://tinyurl.com/25x72u2v (last visited Mar. 24, 2024) (opt out meant to ensure "borrowers are protected by Colorado's own lending laws" and prevent out-of-state state banks from circumventing Colorado's consumer protections).

49.      Instead, Section 3 will harm Colorado borrowers.

50.      Section 3 provides:

> In accordance with section 525 of [DIDMCA], the general assembly declares that the state of Colorado does not want the amendments … made by sections 521 to 523 of [DIDMCA], prescribing interest rates and preempting state interest rates to apply to consumer credit

transactions in this state. The rates established in articles 1 to 9 of this title 5 control consumer credit transactions in this state.

HB 23-1229 § 3 (codified at Colo. Rev. Stat. § 5-13-106).

51.     The wording of Colo. Rev. Stat. § 5-13-106 does not track DIDMCA Section 525 (*supra* ¶ 36) "explicitly and by its terms," as Section 525 requires. Instead of stating that Colorado "does not want the amendments … to apply *with respect to loans made in*" Colorado, as Section 525 mandates, Colorado's opt-out provides that the state "does not want the amendments … prescribing interest rates and preempting interest rates to apply *to consumer credit transactions in this state*." (emphases added).

52.     Given the UCCC's extraordinarily broad definition of when a consumer credit transaction is deemed "made in" Colorado, *see* ¶ 44, *supra*, Colorado's opt out will apply far more expansively than Congress authorized or intended through Section 525, including to (1) nearly any loan that a Colorado consumer chooses to enter into while physically in Colorado—no matter where the lender is located, or where the loan is "made" under settled federal precedent; and (2) any loan made to anyone anywhere, if the creditor "receive[s]" the loan agreement in Colorado. *See* Colo. Rev. Stat. § 5-1-201(1)(a)-(b).

### 2.     Section 3 improperly exceeds Colorado's opt-out rights under DIDMCA

53.     While Congress conferred on states the authority to *enact* opt outs from DIDMCA, Congress did not envision or authorize that the opt outs, or their scope, should be understood by reference to state law.

54.     Federal courts turn to federal law when interpreting federal statutes such as DIDMCA. *See Hill v. Whitlock Oil Servs., Inc*., 450 F.2d 170, 173 (10th Cir. 1971) ("Federal, not local, law applies in the interpretation and application of federal statutes.") (citing *Prudence Realization Corp. v. Geist*, 316 U.S. 89, 95 (1942)). Unless Congress specifically provides that a

federal law is to be interpreted with reference to state law, federal law governs a federal law's interpretation. *See, e.g.*, *Jerome v. United States*, 318 U.S. 101, 104-05 (1943) (noting that courts "generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law").

55.     Accordingly, because Section 525 is a federal statute, and Section 525 does not incorporate any state definitions, a uniform federal definition of where a loan is "made" governs DIDMCA opt outs, not Colorado's chosen definition found in UCCC Section 5-1-201(1). *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (citing *Jerome*, 318 U.S. at 104); FDIC Interp. Ltr. 88-45 (June 29, 1988), 1988 FDIC Interp. Ltr. LEXIS 46, at \*4 ("Section 525 is a Federal statute. It must be interpreted as having a single meaning throughout the nation.").

56.     When Congress preserved states' rights to "opt out" from DIDMCA preemption of state interest-rate limits for loans "made in" the opting-out state, Congress meant just that: States that opted out could still impose their interest -rate limits on loans actually made in the opting-out state within the meaning of federal law. Under the plain text, that opt-out right does not look to where a *consumer* is located; it turns on where the key functions associated with originating ("mak[ing]") the *loan* take place. *See* DIDMCA § 525, 94 Stat. 167.

57.     The meaning of "made in" in DIDMCA Section 525 accords with the practical, functional analysis the Supreme Court undertook in *Marquette*, decided just two years before DIDMCA was enacted. *Marquette* held that for the purposes of determining whether a state's interest rate cap law is preempted under NBA Section 85, a national bank is located where its lending operations physically occur, not where its customers may live or use their credit cards:

> Although the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska, credit on the use of their cards is nevertheless similarly extended by Omaha Bank in Nebraska by the

> bank's honoring of the sales drafts of participating Minnesota merchants and banks. Finance charges on the unpaid balances of cardholders are assessed by the bank in Omaha, Neb., and all payments on unpaid balances are remitted to the bank in Omaha, Neb. Furthermore, the bank issues its BankAmericards in Omaha, Neb., after credit assessments made by the bank in that city.

*Marquette*, 439 U.S. at 311-12. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.").

58.     Federal banking regulators and courts have long confirmed this approach to determining where a bank is located and makes its loans. Both the OCC and the FDIC, for example, have consistently explained in related contexts that under federal law a bank is "located" in the state in which it is chartered *unless all three* "non-ministerial" functions involved in making a loan all physically occur in another state: (1) loan approval; (2) disbursal of loan proceeds; and (3) communication of the credit decision. *See* OCC Interp. Ltr. No. 1171, 2020 WL 8176065 (June 1, 2020); FDIC General Counsel's Op. No. 11, Interest Changes by Interstate State Banks, 63 Fed. Reg. 27282 (May 18, 1998); *see also* 85 Fed. Reg. at 44,148, 44,153 (discussing when a loan is made for purposes of federal law).[4]

59.     Although the statutory terms "located" (as used in DIDMCA Section 521 and NBA Section 85) and "made in" (as used in Section 525) need not be coextensive, they do overlap significantly. And because they are both focused on functional inquiries into the extension of credit, regulators and courts have considered some of the same factors interchangeably, applying

---

[4] Loan approval occurs in the state where the person charged with approving or denying the credit is located. 63 Fed. Reg. at 27286 (*citing* OCC Interp. Ltr. No. 822, 1998 WL 121663 (Feb. 17, 1998)). The site of final approval is the state in which credit is granted. *Id*. Disbursal occurs in the state where loan proceeds are physically disbursed from the bank. *Id.* This is distinct from the *delivery* of previously disbursed funds. Loans can be disbursed in person or credited to an account at a branch. *Id.* The site that first communicates approval of a loan to a customer extends the credit. *Id.*

*Marquette*'s functional approach in considering where a loan is "made." *See, e.g.*, 63 Fed. Reg. at 27286 (Congress intended courts to inquire into location of non-ministerial functions in determining "where a loan *is made* for purposes of determining the state [interest-rate] law to be applied to a loan") (emphasis added); OCC Interp. Ltr. No. 822, 1998 WL 121663, at *5 (outlining "three element test of where a loan *is made* by an interstate bank") (emphasis added)); FDIC Interp. Ltr. 88-45, 1988 FDIC Interp. Ltr. LEXIS 46, at *4 ("The determination of where a loan is made" depends on "an analysis of the facts surrounding the extension of credit."); *MorEquity, Inc. v. Naeem*, 118 F. Supp. 2d 885, 897 (N.D. Ill. 2000) ("All three of the 'non-ministerial functions' must occur at the host state branch for the loan to be considered *made* in the host state") (emphasis added), *aff'd on reconsideration*, No. 99C735, 2001 WL 1426518, at *1 (N.D. Ill. Feb. 8, 2001).

60. This articulation of the inquiry by regulators and courts is consistent with the program-specific analysis in *Marquette*, is workable, and promotes a consistent standard for modern-day, interstate, online banking (rather than different regimes applied by each opting-out state), while still preserving the state sovereignty Congress intended to protect with Section 525.

61. Under Section 525, states thus may choose to regulate their own state-chartered institutions. But DIDMCA Section 525 does not authorize—and Congress never intended it to authorize—a state to opt out with respect to all loans made to a consumer living in an opting-out state without regard to whether the loan was made by an out-of-state bank that has no base of operations in the opting-out State. States may not invoke the Section 525 opt out to regulate out-of-state state-chartered banks that do not engage in any lending-related decision-making or other "non-ministerial" lending operations in the opting-out state. When a consumer borrows from an out-of-state bank through the internet, via a mobile app, or by phone, that loan is not "made in" the consumer's state, and under federal law, the opt-out cannot affect the loan.

### D.   Effects of Colorado's Opt-Out

#### 1.   The opt out will affect a wide variety of credit products offered by Plaintiffs' members, many of which are state-chartered banks

62.   Plaintiffs' members offer consumers in Colorado a wide variety of useful, familiar, everyday credit products, at a range of rates and fee options. These products include (i) personal installment loans, which can be used for debt consolidation, financial emergencies, to finance large purchases, family vacations, milestone events such as weddings, medical expenses, home improvements, and the like; (ii) BNPL loans offered by retailers at "point of sale" to fund single larger-cost consumer purchases, such as major appliances; (iii) general purpose credit cards that charge fees above a capped percentage of the credit line; (iv) private label, or "closed loop," store-brand, credit cards usable only at a single merchant; and (v) direct vehicle finance loans made for the purpose of purchasing certain new or used vehicles. Plaintiffs' members do not offer high-cost, short-term, small dollar loans at exorbitant rates—the sort of loans Colorado claims it is trying to target with the opt out.

63.   The ability to offer their products at rates above those permitted by the Colorado UCCC—but that are legal under DIDMCA—allows Plaintiffs' members to offer credit to consumers who would not otherwise have access to it because their credit profiles would be deemed too risky. Often, being able to charge a higher rate or fee to account for risk of default (or for purposes of deterring default) means the difference between being able to offer borrowers with higher risk profiles a loan and determining that it is too costly to offer them credit at all.

64.   Plaintiffs are committed to responsible and ethical lending, and to protecting access to credit and consumer choice. But if Colorado's opt out goes into effect as intended, and applies to loans made to Colorado consumers by Plaintiffs' members located outside Colorado, Plaintiffs'

members will be forced to curtail lending to some or all Colorado residents, reducing Coloradans' access to responsible, popular, and useful consumer credit products.

### 2. National banks are not affected by Colorado's opt out but offer materially identical products, with materially identical rates and fees, as state-chartered banks

65.     Meanwhile, the opt out will have no effect on national banks that lend to Colorado consumers. They will still be shielded by NBA preemption. *See Marquette*, 439 U.S. 299; *Smiley*, 517 U.S. 735; 12 U.S.C. § 85. Many national banks currently export their rates and fees into Colorado, often charging rates in excess of the limits in the Colorado UCCC.

66.     National banks offer similar products to Colorado consumers as Plaintiffs' members, with a similar range of APRs and interest rates. For example, many national banks offer personal installment loans for amounts and loan terms similar to those offered by many of Plaintiffs' members—and at APRs ranging to over 30% APR, often including origination fees.[5] Several national banks offer "installment on card" loans, allowing consumers to split a single large credit card charge into a separate installment payment plan, also with APRs over 21%.[6] And national banks also partner with retailers to offer store-brand credit cards that exceed the UCCC's 21% rate cap, with rates often in excess of 30% APR, and late fees over $40.[7]

---

[5] *See*, *e.g.*, Personal Loans, SoFi, https://tinyurl.com/3zdsme27 (last visited Mar. 23, 2024) (product descriptions and APR disclosures for SoFi Bank, N.A.); Personal Loans, TD Bank, N.A., https://tinyurl.com/4j33pv6n (last visited Mar. 23, 2024); Personal Loans, LendingClub Bank, N.A., https://tinyurl.com/mtcp4zby (last visited Mar. 23, 2024); Personal Loans, First Nat'l Bank of Omaha, https://tinyurl.com/48x7tspc (last visited Mar. 23, 2024).

[6] *See*, *e.g.*, Citi Simplicity Card Terms & Conditions, Citi Bank, https://tinyurl.com/kyeck63y (last visited Mar. 23, 2024) (APR and fee information).

[7] *See, e.g.*, Retail Credit Cards, Synchrony, https://tinyurl.com/445sxw75 (last visited Mar. 23, 2024) (explaining that Synchrony is "the leading issuer of private label credit cards"); Card Issued by TD Bank, N.A., Target, https://tinyurl.com/uca4xd5h (last visited Mar. 23, 2024) (product descriptions); Card Issued by TD Bank, N.A., Nordstrom, https://tinyurl.com/ydrjrycs (last visited

67.     These national banks do not currently, nor will they ever have to, adhere to the Colorado UCCC's rate and fee caps for these products.

>        **3.     Plaintiffs' members, as well as Colorado consumers, will be injured by Colorado's purported opt out**

68.     Plaintiffs' members will suffer irreparable harm if Colorado's opt out takes effect without a judicial declaration that the opt out is inapplicable for loans not "made in" Colorado as defined by federal law.

69.     Specifically, and as described *supra* ¶ 13, Plaintiffs' members have already begun to incur both compliance costs and the cost of strained relationships with partners in preparing to comply with the opt out. And once the law goes into effect, Plaintiffs' members will (i) lose revenue as a result of lower interest rates and fees; (ii) lose both revenue and goodwill through strained or lost relationships with customers, retailers, and other partners; (iii) lose opportunities for new customer and retailer relationships, including losing customers and retailers to national banks; (iv) incur ongoing compliance costs; and (v) risk consumer lawsuits and enforcement actions.

70.     The balance of equities favors injunctive relief against Colorado's opt out. Colorado consumers—whom Defendants are duty-bound to protect—will suffer harm themselves if the law goes into effect as intended. Consumers, particularly those at the low end of the credit spectrum, will have reduced access to the responsible, needed consumer credit products offered by Plaintiffs' members. These products will likely be offered by far fewer financial institutions if state-chartered institutions can no longer profitably offer them to Coloradans. Yet national banks

---

Mar. 23, 2024) (available by clicking "APR and Fee Information" hyperlink); Card Issued by Citibank, N.A., Macy's, https://tinyurl.com/mr3wu7w5 (last visited Mar. 23, 2024); Pottery Barn Card Issued by Capital One Bank, N.A., https://tinyurl.com/2c6p3fw7 (last visited Mar. 23, 2024) (rate and fee information).

will be able to continue to charge the same rates for these same products. Under Colorado's new regime, state-chartered banks will simply be unable to compete with them effectively. With reduced competition from state banks, national banks will have less incentive to constrain their rates for these products.

**CLAIMS**

**COUNT ONE**
**Violation Of The Supremacy Clause Of The United States Constitution and Sections 521 and 525 of the Depository Institutions Deregulation and Monetary Control Act of 1980**

**(U.S. Const. art. VI, cl. 2; Pub. L. No. 96-221, 94 Stat. 132, 164-165, 167 (1980))**

71.     Plaintiffs incorporate all the prior paragraphs of this Complaint.

72.     Colorado's definition of when a loan is "made in" Colorado for purposes of its DIDMCA opt out goes far beyond that allowed by federal law, and thus Colorado's DIDMCA opt out violates the Supremacy Clause, is preempted by DIDMCA, and is invalid.

73.     Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, state laws that "interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution," have no force or effect. *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824).

74.     Section 525 only authorizes states to opt out from DIDMCA's preemption provisions, including Section 521, "with respect to loans *made in* such State." DIDMCA § 525, 94 Stat. 167 (emphasis added). And Section 521 expressly "preempt[s]" "any State constitution or statute" that purports to limit the ability of state-chartered banks to lend at their home-state rates with respect to loans not covered by the Section 525 opt out.

75.     A loan is "made in" a state other than a bank's home state only if *all* the functions involved in making the loan, including approval and disbursal, occur in that other state. DIDMCA Section 525 incorporates that settled, federal definition of "made in," which focuses on the core functions surrounding the extension of credit.

23

76.     Contrary to Section 525, Colorado's UCCC treats almost all loans to Colorado consumers—including all loans by an out-of-state bank that ever advertises in the state online, or where a loan agreement is received by the bank in Colorado—as "made in" Colorado regardless of where the "non-ministerial functions" occur. *See* Colo. Rev. Stat. § 5-1-201(1).

77.     Indeed, Colorado's disregard for controlling federal law is evident on the face of its opt out. Whereas Section 525 authorizes a state to opt out of DIDMCA sections 521 through 523 if the state "adopts a law … which states explicitly and by its terms that such State does not want the amendments made by such sections to apply with respect to *loans made in* such State," DIDMCA § 525, 94 Stat. 167 (emphasis added), Colorado's opt-out purports to apply to all "*consumer credit transactions in this state,*" HB 23-1229 § 3 (emphasis added). Colorado's recipient-focused triggers, *see* Colo. Rev. Stat. § 5-1-201(1)(a)-(b), differ substantially from the functional analysis of a *bank*'s activities that the federal definition of "made in" requires.

78.     That is simply not what Section 525 permits, or what Congress intended. Rather, Congress allowed states to opt out with respect to loans "made in" a state *as defined under federal law*, not as each state may independently choose to define that term.

79.     By purporting to opt out with respect to any consumer credit transaction involving a Colorado consumer, Colorado disregards the plain terms of DIDMCA, usurps federal authority to define where a loan is made for purposes of DIDMCA, and intrudes on the ability of other states to regulate loans made within their borders.

80.     Colorado's opt out violates the Supremacy Clause and is preempted.

### COUNT TWO
### Violation Of The Commerce Clause Of The United States Constitution

### (U.S. Const. art. I, § 8, cl. 3)

81.     Plaintiffs incorporate all the prior paragraphs of this Complaint.

82.     Section 3 violates the Dormant Commerce Clause because Colorado's interpretation of where a loan is made under its own laws—rather than under federal law as DIDMCA requires—subjects out-of-state banks to inconsistent obligations across states and would impede the flow of commerce.

83.     The Commerce Clause of the U.S. Constitution grants Congress the sole authority "[t]o regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3. Deriving from that grant of constitutional power, the Dormant Commerce Clause limits state action that unduly restricts interstate commerce.

84.     States lack the authority to enact protectionist state statutes that discriminate against and "burden[] out-of-state competitors." *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (discussing Dormant Commerce Clause jurisprudence). Nor can state laws contribute to "a lack of national uniformity" that impedes commerce. *Id.* at 379 n.2. And the Dormant Commerce Clause bars state laws that regulate only intrastate activities when they increase "the likelihood" for "inconsistent obligations" across states, *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986), where the resultant burden exceeds local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

85.     The application of Colorado's interest-rate laws to loans that are "made in" other states as a matter of federal law—as mandated by Section 3—is unconstitutional under these principles. If each opting-out state could choose to apply its own law to any loan that bore any connection to that state, state-chartered banks would face conflicts and uncertainty in determining what law applied to any given loan. Section 3 thus increases "the likelihood" for "inconsistent obligations" across states, *Brown-Forman Distillers*, 476 U.S. at 583, and its burden on commerce plainly exceeds the putative local benefits it presumably was enacted to confer on Coloradans.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      Declare that any attempt to apply or enforce the Colorado UCCC, Colo. Rev. Stat. §§ 5-1-101 *et seq.*—including the opt out contained in Colo. Rev. Stat. § 5-13-106—with respect to loans not made in Colorado (as defined by federal law), even if those loans are considered made in Colorado under Colo. Rev. Stat. § 5-1-201(1), is preempted, invalid, and a violation of the Supremacy Clause;

2.      Declare that any attempt to enforce the Colorado UCCC and Colo. Rev. Stat. § 5-13-106 with respect to loans made outside Colorado (as defined by federal law described above), even if those loans are considered made in Colorado under Colo. Rev. Stat. § 5-1-201(1), violates the Dormant Commerce Clause;

3.      Preliminarily and permanently enjoin Defendants and their agents from taking any action to enforce or give effect to the Colorado UCCC with respect to loans that, under federal law, are not made in Colorado;

4.      Enter judgment in favor of NAIB, AFSA and AFC; and

5.      Award NAIB, AFSA and AFC all other relief the Court deems just and proper.

CHRISTOPHER M. WALCZYSZYN
Davis Wright Tremaine LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
(212) 402-4081
chriswalczyszyn@dwt.com

TYLER J. BOURKE
Davis Wright Tremaine, LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 622-3150
tylerbourke@dwt.com

CHRIS SWIFT*
Davis Wright Tremaine, LLP
560 SW 10th Avenue
Suite 700
Portland, OR 97205
(503) 276-5505
chrisswift@dwt.com

/s/ David M. Gossett
DAVID M. GOSSETT
CHAVA BRANDRISS
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com
chavabrandriss@dwt.com

ED PERLMUTTER
Holland & Knight LLP
1801 California Street
Suite 5000
Denver, CO 80202
(303) 974-6552
Ed.Perlmutter@hklaw.com

*Attorneys for the National Association of Industrial Bankers and the American Financial Services Association*

MORGAN L. RATNER*
Sullivan & Cromwell LLP
1700 New York Avenue NW
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

MATTHEW A. SCHWARTZ*
LESLIE B. ARFFA*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
schwartzmatthew@sullcrom.com
arffal@sullcrom.com

*admission to U.S. District Court for the District of Colorado pending*

*Attorneys for the American Fintech Council*

DATED: March 25, 2024