IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:24-cv-00812-DDD-KAS

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS;
AMERICAN FINANCIAL SERVICES ASSOCIATION; and
AMERICAN FINTECH COUNCIL,

  Plaintiffs,

v.

PHILIP J. WEISER, in his official capacity as Attorney General of the
State of Colorado; and
MARTHA FULFORD, in her official capacity as Administrator of the
Colorado Uniform Consumer Credit Code,

  Defendants.

---

## ORDER GRANTING MOTION
## FOR PRELIMINARY INJUNCTION

---

The plaintiffs—National Association of Industrial Bankers, American Financial Services Association, and American Fintech Council—are trade associations whose members include (or partner with) state-chartered, FDIC-insured banks that engage in consumer lending. A federal statute, 12 U.S.C. § 1831d, caps the interest rates that such banks may charge on loans, and that statute expressly preempts any lower interest-rate caps that may be imposed by state law. A state may, however, opt out of Section 1831d's application "with respect to loans made in" that state, and Colorado has done so.

The dispute here is over what it means for a loan to be "made in" Colorado. The plaintiffs contend that Colorado has attempted to exceed the scope of its opt-out authority by interpreting "loans made in"

Colorado to include all loans made to borrowers located in Colorado, regardless of where the lender is located, which the plaintiffs say is beyond the statutory scope of that phrase. They move to preliminarily enjoin the defendants—Colorado Attorney General Philip J. Weiser and Colorado Uniform Consumer Credit Code Administrator Martha Fulford (collectively, "the State")—from enforcing Colorado's lower interest-rate caps with respect to loans made by lenders that are not located in Colorado. Doc. 24.

For the following reasons, I agree with the plaintiffs that the determination of where a loan is "made" under Section 1831d depends on where the lender performs its loan-making functions, not the borrower's location. The plaintiffs' motion for a preliminary injunction is therefore granted, and the defendants are enjoined from enforcing the interest rates in the Colorado UCCC with respect to any loan made by the plaintiffs' members, to the extent the loan is not "made in" Colorado and the applicable interest rate in Section 1831d(a) exceeds the rate that would otherwise be permitted.

## BACKGROUND

Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (often referred to in case law as "DIDA" or "DIDMCA") added a new Section 27 to the Federal Deposit Insurance Act, which is now codified at 12 U.S.C. § 1831d. Under Section 1831d, a state-chartered bank may charge interest on loans at a rate up to the greater of (a) 1% above the Federal Reserve discount rate in the Federal Reserve district "where [the] bank . . . is located" ("discount-plus-one rate"), or (b) the rate allowed by the laws of the state "where the bank is located." 12 U.S.C. § 1831d(a). Section 1831d expressly preempts any lower interest-rate caps that may be imposed by state law. *Id.* ("[I]f the applicable rate prescribed in this subsection exceeds the rate [a] bank

. . . would be permitted to charge in the absence of this subsection . . . any State constitution or statute . . . is hereby preempted for the purposes of this section . . . ."). The statute states that it was enacted "to prevent discrimination against" state-chartered banks, *id.*, because the National Bank Act similarly permits national banks to charge interest at a rate up to the greater of the discount-plus-one rate or the rate allowed by the laws of the state where the bank is located, 12 U.S.C. § 85. *See also FDIC Gen. Counsel's Op. No. 11*, 63 Fed. Reg. 27282-01, 1998 WL 243362, at *27283 (May 18, 1998) ("Section 85 has been recognized to be the 'direct lineal ancestor' of section 1831d . . . . Congress made a conscious choice to pattern section 1831d after section 85 to achieve competitive equality in the area of interest charges between state and national banks.").

One effect of these statutes is that a bank chartered in a particular state (its "home" state) may charge interest to borrowers in that state at the discount-plus-one rate, even if that rate exceeds the rate permitted by the home state's laws. Another effect is that a bank may "export" the interest-rate caps of the state "where the bank is located" (which is often, but not always, its home state) when lending to borrowers who reside in a different state (the "host" state), even if the rate cap of the state where the bank is located exceeds the rate permitted by the host state's laws. *See Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978) (national banks); *Greenwood Tr. Co. v. Massachusetts*, 971 F.2d 818 (1st Cir. 1992) (state-chartered banks). The state "where [a] bank is located" for purposes of Section 1831d and Section 85 depends on the state in which the bank is chartered, the state(s) in which it maintains branches, and the state(s) in which three "non-ministerial" functions of loan-making occur: loan approval (*i.e.*, the decision to extend credit), extension of credit (*i.e.*, the first communication of final approval of the loan), and disbursal of the loan proceeds (which is

distinguished from delivery of the disbursed funds to the borrower). *See FDIC Op. No. 11*, 1998 WL 243362, at \*27285. A bank "is located" in its home state and may export its home state's interest-rate caps when lending to a borrower in a different state unless (a) all three non-ministerial functions are performed by a branch or branches located in the borrower's host state, or (b) at least one non-ministerial function occurs in the host state and "based on an assessment of all of the facts and circumstances, the loan has a clear nexus to the host state." *Id.*

Section 525 of DIDA, which, somewhat oddly, is codified not in a statutory section of the United States Code, but only in the "Effective Date" note to Section 1831d, allows a state to opt out of Section 1831d by adopting a law stating that it "does not want [Section 1831d] to apply with respect to loans made in" that state.[1] 12 U.S.C. § 1831d note (Effective Date). If a state opts out, then whenever a loan is "made in" the opt-out state by any state-chartered bank, that loan is subject only to the opt-out state's interest-rate caps, which may be higher or lower than that of the bank's home state or the federal discount-plus-one rate.

On June 5, 2023, Colorado adopted such an opt-out law, which states that, effective July 1, 2024, "the state of Colorado does not want the amendments to the 'Federal Deposit Insurance Act', 12 U.S.C. sec. 1811 et seq. . . . made by [12 U.S.C. § 1831d], prescribing interest rates and preempting state interest rates to apply to consumer credit transactions in this state." Colo. Rev. Stat. § 5-13-106. Defendant Fulford, as Colorado's UCCC Administrator, has issued an interpretive opinion letter regarding the scope of this opt-out statute, which states that she "interprets § 5-13-106 to apply only to consumer credit transactions 'made in'

---

[1]    Section 85 of the National Bank Act does not contain any opt-out provision with respect to the preemptive federal interest-rate caps that apply to loans made by national banks. *See* 12 U.S.C. § 85.

Colorado in accordance with [12 U.S.C. § 1831d]"; she "understands and interprets § 5-13-106's language of 'in this state' to be wholly congruent and identical with the opt out authorized by Section [1831d] for loans 'made in' the state"; and she "will limit her enforcement, if any, of violations of the opt out, if any, to loans 'made in' Colorado, pursuant to § 5-13-106 and [12 U.S.C. § 1831d]." Doc. 39-1 at 5.

The plaintiffs agree with that, but they argue that the State interprets "made in" too broadly. They say that the determination of where a loan is "made" turns only on where the *bank* is located and performs the above-noted non-ministerial functions. The State contends that a loan is "made in" *both* the state where the *bank* enters into the transaction *and* the state where the *borrower* enters into the transaction. *See* Doc. 38-1 at 10-13 (FDIC's position, which the State explicitly adopted at the preliminary-injunction hearing). The plaintiffs' complaint alleges that any attempt by the State to enforce the interest-rate caps in the Colorado UCCC with respect to loans that are not "made in" Colorado (as that phrase is properly construed under federal law) would exceed the scope of Colorado's opt-out authority under Section 1831d and violate both the Supremacy Clause and the Dormant Commerce Clause of the United States Constitution. *See* Doc. 1.

The plaintiffs move to "preliminarily enjoin Colorado from taking any action to enforce or give effect to [the opt-out in Colo. Rev. Stat. § 5-13-106] with respect to loans not 'made in' Colorado as defined by federal law." Doc. 24 at 26. The plaintiffs' motion asserts only Supremacy Clause preemption arguments as the basis for preliminary injunctive relief. *See generally* Doc. 24. The motion is fully briefed, *see* Docs. 26-32, 39, 45; *see also* Docs. 38-1, 48, and a hearing was held on May 16, 2024, Doc. 56.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). One may be granted "only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018).

To succeed on their motion for preliminary injunction, the plaintiffs must show: (1) that they are "substantially likely to succeed on the merits"; (2) that they will "suffer irreparable injury" if the injunction is denied; (3) that their "threatened injury" without the injunction outweighs the State's under the injunction; and (4) that the injunction is not "adverse to the public interest." *Mrs. Fields*, 941 F.3d at 1232; *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth preliminary-injunction factors "merge" where, as here, the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Movants seeking an injunction of a "disfavored" type face a heavier burden and must make a "strong showing" that the first and third factors weigh in their favor. *Mrs. Fields*, 941 F.3d at 1232. A disfavored preliminary injunction is one that: (1) mandates action (rather than prohibiting it); (2) changes the status quo; or (3) grants all the relief that the moving party could expect from a trial win. *Id.* The State contends that the injunction the plaintiffs seek here is of the third disfavored type. I find that doubtful,[2] but I need not resolve that question, because, as

---

[2] The relief the plaintiffs seek in a final ruling would be to permanently enjoin the State from giving effect to Colorado's opt-out statute under the State's interpretation of "loans made in" Colorado, which would impact infinitely more loans than the temporary relief sought here.

discussed further below, the plaintiffs have made a showing as to their likelihood of success on the merits and threatened irreparable harm sufficient to satisfy even the heightened standard required for disfavored injunctions.

## DISCUSSION

### I.  Subject-Matter Jurisdiction

As a threshold matter, the State contends that the plaintiffs lack standing and that their claims are not ripe. Doc. 39 at 16-19.

### A.  Standing

To demonstrate standing, the plaintiffs must show that: (1) they have suffered an injury in fact; (2) the injury is fairly traceable to the challenged conduct of the defendants; and (3) the injury is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The State challenges only the injury-in-fact prong of the standing inquiry, arguing that the plaintiffs have not shown a sufficiently concrete and imminent injury. The State does not challenge the plaintiffs' organizational standing to bring suit on behalf of their members. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

As to injury in fact, the plaintiffs assert that (1) their members are already incurring significant administrative costs to comply with the interest-rate caps in the Colorado UCCC and will continue to incur such costs in the event the State's interpretation of "loans made in" Colorado prevails and its asserted scope of the opt-out is found to be valid; and (2) their members will lose both revenue and customer goodwill if they can no longer profitably offer their loan products to certain Colorado consumers because of the lower interest-rate caps in the Colorado UCCC. Doc. 24 at 24-25. These injuries are sufficient to confer standing.

When plaintiffs take preventative measures and forego lawful conduct in order to avoid a credible threat of enforcement of an allegedly unlawful statute, then they have suffered a cognizable injury for standing purposes. *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 902-03 (10th Cir. 2016); *accord Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (cognizable injury where plaintiff association's members were "in an unenviable double-bind: submit to the preempted law and endure the costs of modifying otherwise uniform procedures, or violate the law and face the likelihood of lawsuits and penalties"). A threat of enforcement is generally credible where (1) a challenged statutory provision on its face proscribes the conduct in which a plaintiff wishes to engage, and (2) the state has not disavowed any intention of invoking the provision against the plaintiff. *Supreme Ct. of N.M.*, 839 F.3d at 901. "[T]he existence of a statute implies the threat of its enforcement . . . ." *Consumer Data*, 678 F.3d at 902.

The threat of enforcement of the Colorado UCCC against the plaintiffs' members if they continue to offer loans to Colorado consumers at interest rates above Colorado's caps after the July 1 effective date of the opt-out is a credible one. As discussed above, the State's interpretation of "loans made in" Colorado is at odds with what the plaintiffs contend is the correct statutory construction of Section 1831d's opt-out provision, so there is a live controversy. And the State has not disclaimed enforcement against the plaintiffs' members if they violate Colorado's interest-rate caps on loans that fall within the State's broader interpretation of "loans made in" Colorado. *See* Doc. 39-1 at 5. The plaintiffs' members need not risk actual enforcement to have standing to challenge the scope of the opt-out and the State's probable future enforcement of allegedly preempted Colorado UCCC interest rates. *Supreme Ct. of N.M.*, 839 F.3d at 901.

The State argues that the plaintiffs' asserted injuries are "too conjectural to confer standing in the pre-enforcement context because determining where a loan is 'made,' and even what [Colorado UCCC] rate applies, is necessarily fact intensive, and th[e] Court cannot determine whether Colorado has exceeded Section [1831d]'s opt-out until it has an actual loan to analyze." Doc. 39 at 17-18. The State notes that "[t]he only loans that could confer standing here are those that Plaintiffs' members would only offer if they could exceed Colorado's caps, *and* they must be loans that do not meet [Section 1831d]'s definition of 'made in' but are nonetheless subject to Colorado's caps by the Opt-Out," and argues that "the number of loans affected could be a handful of loans, or none." *Id.* at 18. It is true that to confer standing, a plaintiff's injury must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). But the plaintiffs have submitted declarations from their executive officers and from officers of several of their member banks detailing the loans that will be affected as well as the administrative costs, lost revenue, and intangible losses like lost customers and goodwill that the plaintiffs' members will suffer if the full scope of Colorado's opt-out (under the State's interpretation of "made in") is permitted to take effect. *See* Doc. 26 ¶¶ 11-19; Doc. 27 ¶¶ 14-22; Doc. 28 ¶¶ 12-19; Doc. 29 ¶¶ 13-20; Doc. 30 ¶¶ 10-17; Doc. 31 ¶¶ 10-13; Doc. 32 ¶¶ 8-15. The plaintiffs need not precisely quantify the number of loans that will be affected or the dollar amount of revenue that will be lost in order to demonstrate an injury in fact. The injuries asserted are sufficiently concrete and particularized.

As noted above, the State does not challenge the traceability and redressability prongs of the standing inquiry, and it seems uncontroversial that the asserted injuries to plaintiffs' members are traceable to the challenged opt-out statute, and that enjoining the Colorado Attorney

General and UCCC Administrator from enforcing Colorado UCCC inter-est-rate caps with respect to loans to which Section 1831d's preemption allegedly still applies would provide relief for the plaintiffs' members. The plaintiffs have successfully demonstrated standing.

### B. Ripeness

As to ripeness, the State contends that the plaintiffs' asserted inju-ries have not matured sufficiently to warrant court intervention. Ripe-ness involves both constitutional and prudential components. *Supreme Ct. of N.M.*, 389 F.3d at 903. The requirements of standing and consti-tutional ripeness overlap—if an injury is sufficiently imminent to estab-lish standing, as it is here, constitutional ripeness will necessarily also be satisfied. *Id.* Prudential ripeness turns on both the "fitness of the is-sues for judicial decision" and the "hardship to the parties of withholding court consideration." *Id.* Where the possibility of an enforcement action rests on uncertain or contingent future events, a claim may not be pru-dentially ripe for judicial review if waiting for those contingencies to play out would significantly advance a court's ability to deal with the legal issues presented. *Id.* at 904.

In this case, waiting would not aid the Court in resolving the parties' dispute. The plaintiffs' preemption claim turns on a matter of law that can be resolved without further factual development—the proper statu-tory construction of "loans made in" Colorado under federal law. Though the State is correct that the determination of where any particular loan is made will be a case-by-case factual inquiry, those factual distinctions make no legal difference as to the scope of the federal statue's opt-out language. To resolve the dispute in this case, I need only decide whether the location of the borrower is one of the facts that should be taken into account in deciding where a loan is "made" under the opt-out provision. The plaintiffs' claims are both constitutionally and prudentially ripe for

review. *See Consumer Data*, 678 F.3d at 907 ("[R]ipeness is seldom an obstacle to a pre-enforcement challenge . . . where the plaintiff faces a 'credible threat' of enforcement, and 'should not be required to await and undergo [enforcement] as the sole means of seeking relief.'").

## II.  Preliminary-Injunction Factors

### A.  Likelihood of Success on the Merits

The plaintiffs have made a strong showing that they are substantially likely to succeed on the merits of their preemption claim. They have pleaded a viable cause of action, and their proffered construction of "loans made in" Colorado is likely to prevail over the State's proposed construction.

#### 1.  Cause of Action

The State unpersuasively contends that the plaintiffs' claim cannot proceed because there is no private right of action under the Supremacy Clause or Section 1831d. Doc. 39 at 14-16. A three-step analysis applies to the question of whether a plaintiff has a cause of action. A court must determine: (1) what alleged substantive rights the plaintiff is seeking to vindicate; (2) what putative causes of action the plaintiff is raising based on those rights; and (3) which, if any, of those causes of action are viable with respect to the relief requested. *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 899 (10th Cir. 2017) (citing *Davis v. Passman*, 442 U.S. 228, 239-41 & n.18 (1979)).

The right the plaintiffs are seeking to vindicate is that of their members to charge interest at the rates specified in Section 1831d on loans as to which Colorado cannot opt out of the statute's application. For a statute to create private rights, it must be phrased in terms of the persons benefited rather than focused on the persons regulated. *Id.* at 903. Section 1831d(a) satisfies this inquiry, as it states that its purpose is "to

prevent discrimination against" state-chartered banks, and that such banks "may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section . . . charge on any loan" the greater of the discount-plus-one rate or the rate allowed by the laws of the state where the bank is located. 12 U.S.C. § 1831d(a). The putative cause of action the plaintiffs raise is a claim in equity under *Ex parte Young*, 209 U.S. 123 (1908).[3] Doc. 1 at 26; Doc. 45 at 7-8. The State does not raise any arguments as to these first two steps of the cause-of-action analysis.

As to the third step, the State contends that the asserted cause of action is not viable because banks are not among the class of litigants that may enforce the rights created by Section 1831d. "Congress may displace the equitable relief that is traditionally available to enforce federal law" if the statute creating the rights at issue displays an "intent to foreclose" the availability of such relief. *Armstrong*, 575 U.S. at 328-29; *accord Davis*, 442 U.S. at 241 ("Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner."). The "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," particularly when Congress vests an agency with authority to administer a complex statutory scheme. *Armstrong*, 575 U.S. at 328-29. The State argues that is the case here because the Federal Deposit Insurance Act, of which Section 1831d is a part, "expressly

---

[3]   Although the plaintiffs' complaint styles their claim as one for violation of the Supremacy Clause, *see* Doc. 1 ¶¶ 71-80, their reply brief clarifies that they are bringing an equitable claim under *Ex parte Young*. Doc. 45 at 7-8. The State is correct that the Supremacy Clause does not create a cause of action. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015).

and impliedly precludes private enforcement actions, primarily vesting authority with the FDIC." Doc. 39 at 15 (citing 12 U.S.C. § 1818 (FDIC may suspend or terminate bank's insured status or issue cease-and-desist order if bank violates applicable laws or regulations); 12 U.S.C. §§ 1831d(b), 1831g(c)-(d) (borrowers may bring civil action against bank to recover excess interest, but no private right of action to enforce bank compliance with requirement to engage in sound business practices)). The statutory enforcement mechanisms the State points to, however, are all remedies *against* a bank for violations of applicable laws or regulations. Those are not the rules or rights that the plaintiffs seek to enforce in this suit.

The plaintiffs, unlike the plaintiffs in *Armstrong* who sought affirmative relief in the form of additional Medicaid payments, instead seek to use *Ex parte Young* as a shield against allegedly preempted state action. *See Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) (parties may use *Ex parte Young* as shield against enforcement of preempted state laws, "[b]ut matters differ when litigants wield *Ex parte Young* as a cause-of-action-creating *sword*"). "[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong*, 575 U.S. at 326. That is precisely the type of equitable relief that the plaintiffs seek, and neither Section 1831d nor the Federal Deposit Insurance Act as a whole display congressional intent to foreclose the availability of such relief. The plaintiffs therefore have a viable cause of action. *Cf. Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 146 (2d Cir. 2016) (fact that Congress conferred broad enforcement authority on FAA and not on private parties did not imply intent to bar parties from bringing claim "not to enforce the federal law themselves, but to preclude a municipal entity

from subjecting them to local laws enacted in violation of federal requirements").

### 2. "Loans Made In" Colorado

The effect of a state's opt-out of Section 1831d, how to determine where a loan is "made," and whether the opt-out provision permits states to reassert control over the interest rates charged by out-of-state banks to borrowers residing in those states have been open questions since the statute's inception,[4] as the opt-out provision uses language inviting uncertainty and disagreement. These questions have yet to be decided by any court.

### a. Statutory Text

In cases of statutory interpretation, a court must "begin and end [the] inquiry with the text, giving each word its 'ordinary, contemporary, common meaning.'" *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017); *accord Commonwealth of P.R. v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (when interpreting express preemption clause, court must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress's pre-emptive intent," and inquiry begins and ends with statutory language when its meaning is plain). The textual inquiry, though, is not limited to a specific section in isolation— "the text of the whole statute gives instruction as

---

[4]   *See* Jeffrey I. Langer & Jeffrey B. Wood, *A Comparison of the Most Favored Lender and Exportation Rights of National Banks, FSLIC-Insured Savings Institutions, and FDIC-Insured State Banks*, 42 Consumer Fin. L.Q. Rep. 4, 27-28 (1988), https://www.dltlaw.com/wp-content/uploads/sites/1602755/2020/06/FavorableLender-1.pdf ("[T]he application of a state override provision to an interstate loan made by a federally-insured state bank to a borrower residing in the opt-out state is . . . unclear."; noting that FDIC had issued conflicting opinion letters on the issue and advising state-chartered banks to "carefully evaluate their authority to export interest rates . . . into an opt-out state").

to its meaning," and courts should "look to the provisions of the whole law" to determine the meaning of the section at issue. *Star Athletica*, 580 U.S. at 414.

> The opt-out provision reads:

> > Section [1831d is] applicable only with respect to loans made in any State during the period beginning on April 1, 1980, and ending on the date, on or after April 1, 1980, on which such State adopts a law . . . which states explicitly and by its terms that such State does not want this section to apply with respect to loans made in such State, except that this section shall apply to a loan made on or after the date such law is adopted . . . if such loan is made pursuant to a commitment to make such loan which was entered into on or after April 1, 1980, and prior to the date on which such law is adopted . . . .

12 U.S.C. § 1831d note (Effective Date). Diagraming this provision is beyond the grammatical skills of this inferior court. *Cf. United States v. Rentz*, 777 F.3d 1105, 1106, 1109 (10th Cir. 2015) (providing simplified diagram of statutory sentence and noting: "That bramble of prepositional phrases may excite the grammar teacher but it's certainly kept the federal courts busy."); *United States v. Rosales-Garcia*, 667 F.3d 1348, 1356 (10th Cir. 2012) (Gorsuch, J., dissenting) ("This has to be a sentence only a grammar teacher could love. We have here our old nemesis the passive voice, followed by a scraggly expression of time . . . then a train of prepositional phrases linked one after another and themselves rudely interrupted by a pair of parenthetical punctuations."). Suffice it to say that the clause in dispute here is "made in such State," and that "made" in this context is a passive past participle of the verb "to make."

Both sides attempt to tie their argument to this text. *See, e.g.*, Doc. 39 at 10-11 ("made in such State" "includes a focus on the location of the borrower"); Doc. 45 at 9 ("where loans are 'made' . . . necessarily focuses

on the party who 'makes' the loan"); Doc. 38-1 at 10 ("loans are ordinarily understood to be made in the states where the parties enter into the loan transaction"). In the State's view, a loan is "made" by two parties—the bank and the borrower. Doc. 38-1 at 13 ("For a loan to be made, there needs to be both a borrower and a lender . . . ."). But in the plaintiffs' view, while the borrower "obtains" or "receives" a loan, only the bank "makes" a loan. Doc. 45 at 9-10. And it is the plaintiffs' view that is more consistent both with the ordinary colloquial understanding of who "makes" a loan, and, more importantly, with how the words "make" and "made" are used consistently throughout the text of the Federal Deposit Insurance Act, including the DIDA amendments, as well as throughout the rest of Title 12 of the United States Code, which governs "Banks and Banking" and includes the National Bank Act.

While a passive past participle makes the interpretive task harder than it might have been, Congress's use of "made" puts the focus on the act of making a loan. In plain parlance, it is the lender who *makes* a loan; nobody thinks of themselves as "making a loan" when they borrow money from a family member or put a charge on a credit card. Had Congress sought to put the focus on the borrower, as the State argues, it could have done so in many ways. Most easily, for example, by allowing states to opt out as to loans "made to borrowers in such State." Or without even changing the structure of the sentence, Congress could have simply used a borrower-focused word like "accepted" or "obtained" "in such State." Instead, it put the focus on where a loan is "made," which puts the focus on the lender, as the plaintiffs argue.

This interpretation is supported by a look at the broader context, too. Section 1831d itself says that a "State *bank* . . . may . . . charge on any loan or discount *made*," interest up to the specified rates—which implies that it is the bank that "makes" a loan. 12 U.S.C. § 1831d(a) (emphases

added). Other sections of the Federal Deposit Insurance Act consistently use "make" and "made" in the same way, *i.e.*, a loan is "made" *by* a bank *to* a borrower. *See, e.g.*, 12 U.S.C. § 1828(o)(3) ("a loan *made by* an *insured depository institution*[5] . . . ." (emphases added)); 12 U.S.C. § 1831b(a) ("No *insured depository institution* . . . [or] *bank* which is not an insured depository institution, shall *make* any . . . loan . . . ." (emphases added)).

Various other sections of Title 12 reinforce this understanding. *See, e.g.*, 12 U.S.C. § 83(a) ("No national *bank* shall *make* any loan . . . ." (emphases added)); 12 U.S.C. § 85 ("Any *association*[6] may . . . charge on any loan . . . *made* . . . interest at the rate allowed . . . ." (emphases added)); 12 U.S.C. § 143 (an "*association* shall not increase its liabilities by *making* any new loans" (emphases added)); 12 U.S.C. § 371(a) ("Any national *banking association* may *make* . . . loans or extensions of credit . . . ." (emphases added)); 12 U.S.C. § 1757(5) ("A Federal *credit union* . . . shall have power . . . to *make* loans . . . ." (emphases added)); 12 U.S.C. § 1785(f)(1) ("Every insured *credit union* is authorized to . . . *make* loans . . . ." (emphases added)); 12 U.S.C. § 2610 ("No fee shall be imposed . . . by a *lender* in connection with a . . . loan *made by* it . . . ." (emphases added)); 12 U.S.C. § 4742(4) ("a loan *made by* a participating *financial*

---

[5]   An "insured depository institution" includes "any *bank* . . . the deposits of which are insured by" the FDIC. 12 U.S.C. § 1813(c)(2) (emphasis added).

[6]   An "association" means an "[a]ssociation for carrying on the business of *banking*." 12 U.S.C. § 21 (emphasis added); *accord* 12 U.S.C. § 37.

*institution*" (emphases added)).[7] In contrast, when Title 12 speaks to action by borrowers, it states that borrowers "receive" or "obtain"—but not "make"—loans. *See, e.g.*, 12 U.S.C. § 2279aa(7)(C) ("a loan . . . by a cooperative lender to a *borrower* that has *received* . . . a loan" (emphases added)); 12 U.S.C. § 4742(10)(A) ("depositing all required premium charges paid . . . by each *borrower receiving* a loan" (emphasis added)); 12 U.S.C. § 5602(b)(1) ("protecting *borrowers* with respect to the *obtaining* of . . . loans" (emphases added)).

Taken as a whole, the consistent use of "make" and "made" throughout the statutory text indicates that the plain and ordinary answer to the question of *who* "makes" a loan is the bank, not the borrower. It follows, then, that the answer to the question of *where* a loan is "made" depends on the location of the bank, and where the bank takes certain actions, but not on the location of the borrower who "obtains" or "receives" the loan.

The FDIC (whose position the State has adopted) argues, though, that a loan is "made" by both the lender and the borrower. Doc. 38-1 at 10-13. It bases this argument on what it says are "established federal principles" for determining where a contract is made, and it cites to various cases holding that, in the Dormant Commerce Clause context, when parties in two different states enter into a contract, the contract is made in both states. *See id.* Similarly, the State cites to *Quik Payday, Inc. v. Stork*, 549 F.3d 1302 (10th Cir. 2008), also a Dormant Commerce Clause case, for the proposition that "the Tenth Circuit, interpreting federal

---

[7]   *See also, e.g.*, 12 U.S.C. § 1706f(c)(1) ("loan or extension of credit *made to* a *borrower*" (emphases added)); 12 U.S.C. § 2202b(a) ("If a Farm Credit *Bank* forgives . . . any of the principal outstanding on a loan *made to* any *borrower*" (emphases added)) 12 U.S.C. § 2202d(b) ("*lender* may not require any borrower to reduce the outstanding principal balance of any loan *made to* the *borrower*" (emphases added)).

law, has held that where a borrower is in one state and the lender is in another, the loan is made in the state of the borrower's physical location, so that the borrower's state may regulate the loan." Doc. 39 at 11. But these Dormant Commerce Clause cases are of little value with respect to the statutory construction issue in this case, as they address the separate issue of when one state may constitutionally regulate an activity involving conduct that occurs in another state.

The effective-date context of the opt-out provision also undermines the argument that a loan is "made" in the state or states where the bank and the borrower enter into the loan contract. The provision provides that a state's the opt-out law does not apply

> to a *loan made* on or after the date such law is adopted . . . if such *loan is made* pursuant to a <u>*commitment to make such loan*</u> which was entered into on or after April 1, 1980, and prior to the date on which such law is adopted . . . .

12 U.S.C. § 1831d note (Effective Date) (emphases added). In other words, the contract or "commitment to make [a] loan" may be entered into at a different time than the "loan is made." So even if the State is correct that the contract for a loan is made by both the lender and the borrower, and in the state(s) where the lender and the borrower are located when they enter into the contract, that is not determinative of where the loan itself is "made" within the meaning of the statute.

The plain language of Section 1831d's opt-out provision, viewed in the context of the statutory scheme as a whole, indicates that loans are "made" by the bank, and that where a loan is "made" does not depend on the location of the borrower.

### b.   Policy and Legislative History

The statutory text, scraggly and bramble though it may be, ultimately reveals its plain meaning and supports the plaintiffs'

interpretation, which is enough to resolve the question. *Franklin Cal. Tax-free Tr.*, 579 U.S. at 125 (statutory construction begins "with the language of the statute itself," and when its meaning is plain, that "is also where the inquiry should end"). I nevertheless will briefly address the parties' policy arguments and the persuasive authorities they cite. I find that these policy arguments and persuasive authorities are mostly inconclusive or irrelevant and therefore unhelpful. But to the extent they do shed light on the issues, they further support the conclusion that loans are "made" by the bank, and that where a loan is "made" therefore depends on where the bank is located and takes various actions but not on the location of the borrower.

Both sides cite to opinions, interpretive letters, and the like issued by the FDIC and other federal agencies involved in banking regulation. Neither side has addressed what level of deference, if any, must be given to these agency interpretations. Generally, when faced with a problem of statutory construction, a court should give "great deference to the interpretation given the statute by the officers or agency charged with its administration." *Colo. Public Utils. Comm'n v. Harmon*, 951 F.2d 1571, 1578-79 (10th Cir. 1991). But here, most of the agency interpretations in the record touch only tangentially on the Section 1831d opt-out provision and the issue of where a loan is "made" for purposes of that provision. Only one interpretive letter squarely addresses the question, and it does not resolve it. *See Interpretive Letter*, FDIC-88-45, 1988 WL 583093 (June 29, 1988) ("The determination of where a loan is made should be based upon an analysis of the facts surrounding the extension of credit," but "[t]his office is not in a position to analyze [the relevant factors] or determine whether we have all the facts in order to reach a conclusion."); Michael C. Tomkies, *Interstate Consumer Credit Transactions: Recent Developments*, 43 Consumer Fin. L.Q. Rep. 152, 157 (1989), https://www.dltlaw.com/wp-content/uploads/sites/1602755/2020/06/In

terstateConsumerCredit-1.pdf (this letter "provide[s] no express direction regarding the precise method of analysis to be undertaken"). The agency interpretations in the record are therefore inconclusive and do not contain any statutory interpretation for me to defer to; they are persuasive at best.

To the extent the agency interpretations are helpful, they support the conclusion that in common parlance, a loan is "made" *by* a bank and therefore *where* the bank is located and performs its loan-making functions. *See, e.g.*, *FDIC Op. No. 11*, 1998 WL 243362, at *27285 ("If . . . [a] Bank [branch] *in a single host state* performs all the non-ministerial functions (approval of an extension of credit, extension of the credit, and disbursal of loan proceeds to a customer) related to a loan, it '*makes*' the loan *to* the customer . . . and the loan should be governed by the usury provisions of the *host state*."; "[The] distinction . . . of the 'disbursal' function between 'the actual disbursal of proceeds' and 'delivering previously disbursed funds to a customer' is indicative of the type of inquiry Congress intended in order to identify non-ministerial functions which effect *where a loan is made* for purposes of determining the state law to be applied to a loan." (emphases added)); Federal Interest Rate Authority, 85 Fed. Reg. 44146-01, 2020 WL 4192852, at *44146, *44148 to *44151, *44153 (July 22, 2020) (codified at 12 C.F.R. pt. 331) ("*banks* can transfer enforceable rights in the *loans they made*"; contrasting "a loan [that] cannot be said to be *made in* a host State" with one where a host-state branch "approves the loan, extends the credit, and disburses the proceeds to a customer"; "functions involved in *making* the loan"—"loan approval, disbursal of the loan proceeds, and communication of the decision to lend"—are "performed *by*" a bank; "the right to assign loans is a component of *banks'* Federal statutory right to *make* loans" (emphases added)). Though these agency interpretations do not directly address the

statutory construction question at issue in this case, the FDIC's acknowledgment that they "use[] 'made' colloquially," Doc. 38-1 at 17, reinforces that the ordinary colloquial understanding of who makes a loan is the bank, and where a loan is made is where the bank performs its loan-making functions.[8]

Both sides also point to the legislative history behind Section 1831d and its opt-out provision, arguing that Congress's intended policy underlying the statute's enactment supports their proffered construction of "loans made in" a state. The State argues, somewhat persuasively, that the purpose of the opt-out provision was to allow individual states to "return to the status quo ante"—in other words, no federal preemption as to the interest rates that state-chartered banks, wherever located, could charge on loans to borrowers in an opt-out state. Doc. 39 at 7; *see also* Doc. 38-1 (FDIC arguing that "[t]he opt-out puts the state in the same position it would have been in had Section [1831d] never been enacted"). The plaintiffs argue that the purpose behind the opt-out provision was to "soften" Section 1831d's exercise of federal power by allowing opt-out states to "restore [their] ability to control the rates at which their own state banks loaned money by removing their ability to lend at the federal rate," but that it "was not intended as a tool to enable opting-out

---

[8]   *See also Jessup v. Pulaski Bank*, 327 F.3d 682, 685 (8th Cir. 2003) (deferring to agency interpretation of "loan made in any State" in 12 U.S.C. § 1831u(f)(2)(A)(i), another section of the Federal Deposit Insurance Act, that where loan is "made" depends on where "the loan was approved, credit was extended, and loan proceeds were disbursed," "without regard to where the borrower resides"); Tomkies, *supra*, at 158 (arguing that because agency and D.C. Circuit previously "interpreted a provision similar to the [opt-out] provision used in section [1831d] in an analogous context to mean that a loan 'is made' where the loan is approved and funds disbursed, it may be presumed that Congress intended the language employed in section [1831d] to have the same meaning").

states to reach into *other* states to regulate those states' banks' interest rates." Doc. 45 at 15-16.

Ultimately, though, the parties' differing views regarding the legislative purpose behind the opt-out provision are irrelevant, because "policy reasons cannot trump the plain language of the statute." *EagleMed LLC v. Cox*, 868 F.3d 893, 904 (2017). Congress certainly could have been clearer regarding its intention behind the opt-out provision. *See* Tomkies, *supra*, at 157 ("The statute could have been written far more clearly by specifying that the state where the institution is located or the state where the borrower resides could [opt out], if either of these standards reflected the Congressional intent."). But courts cannot re-write a statute to reflect their "perception of legislative purpose." *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 403 (2010). "Any deficiency in the plain language of the statute or the scope of its [opt-out] coverage must be corrected by Congress, not this court." *EagleMed*, 868 F.3d at 904.

The plain meaning of Section 1831d's opt-out provision is that what state a loan is "made in" depends on where the bank is located and performs its loan-making functions and does not depend on the location of the borrower. The plaintiffs have therefore made a strong showing that they are substantially likely to succeed on the merits of their claim that Colorado cannot opt out of the preemptive federal interest-rate caps as to loans that plaintiffs' member banks make outside of Colorado, even if those loans are made to Colorado borrowers. To the extent the heightened standard for a disfavored injunction applies, the plaintiffs' showing on this factor is sufficient to meet that heightened standard.

### B. Irreparable Injury

To show a threat of irreparable harm, a plaintiff must demonstrate "a significant risk that he or she will experience harm that cannot be

compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016).

As discussed above, the plaintiffs have shown that their members will incur administrative costs, lost revenue, and lost customers and goodwill if they must comply with the interest-rate caps in the Colorado UCCC with respect to all loans made to Colorado consumers. While some of those losses may in theory be the sort that are typically compensable with damages, monetary losses in this context are likely not recoverable because a state is generally immune from suit for retrospective monetary relief. *Chamber of Com. of U.S. v. Edmonson*, 594 F.3d 742, 770-71 (10th Cir. 2010); *Kan. Health Care Ass'n v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994). And the plaintiffs have presented evidence that absent an injunction, they will be forced to stop offering their loan products altogether to certain Colorado consumers, and once gone, those customers—and their goodwill along with that of the banks' business partners—may be gone forever. Even if the plaintiffs' members could recover money damages from the State, loss of customers, loss of goodwill, and erosion of a competitive position in the marketplace are the types of intangible damages that may be incalculable, and for which a monetary award cannot be adequate compensation. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004).

The plaintiffs have made a strong showing that their members will suffer irreparable harm if an injunction is not granted.

## C.  Balance of Harms and the Public Interest

The third factor of the preliminary-injunction test requires balancing the harm to the plaintiffs' members of not granting an injunction against the harm to the State if an injunction is granted. *See Fish*, 840 F.3d at 755-56. And where, as here, the government is the opposing party,

the balance-of-harms factor merges with the fourth factor, which requires that the injunction not be adverse to the public interest. *See Nken*, 556 U.S. at 435.

The State notes that if an injunction is issued, the plaintiffs' members "will be free to enter into contracts that include terms prohibited under the UCCC," and argues that "[e]ven if Plaintiffs later lose, Coloradans will have already paid interest at prohibited rates," which could not be remedied by a final judgment in the State's favor. The State and the public certainly have an interest in preventing usurious loans to Coloradans. But as the plaintiffs note, even if the State prevails and its asserted scope of the opt-out is found to be valid, it will not be able to prevent national banks from making loans to Coloradans at above-UCCC rates, because the National Bank Act does not contain any opt-out provision with respect to its preemptive federal interest-rate caps. *See* 12 U.S.C. § 85. So without an injunction, the plaintiffs' member state-chartered banks will be at a disadvantage with respect to national banks, but Colorado consumers will have only marginally more protection from higher interest rates. And the public interest favors enjoining enforcement of likely invalid provisions of state law. *Chamber of Com.*, 594 F.3d at 771.

On the whole, given the plaintiffs' strong showing that they will likely be successful on the merits and their strong showing that they will be irreparably harmed if the State is not enjoined, I find that the balance of harms weighs in the plaintiffs' favor. And to the extent that the heightened standard for a disfavored injunction applies, the plaintiffs' showing on this factor is sufficient to meet that heightened standard.

### III. Terms of Preliminary Injunction

#### A.   Actions to Be Restrained

In fashioning injunctive relief against a state official, a district court must ensure that the relief ordered is "no broader than necessary to remedy the [federal] violation." *EagleMed*, 868 F.3d at 905. In a preemption case, "enjoining Defendants from enforcing the preempted statute . . . [is] sufficient to remedy this federal violation." *Id.* at 905-06. Here, although the plaintiffs' motion asks to enjoin enforcement of Colorado's opt-out law, the preempted statute is actually the Colorado UCCC, and only to the extent the interest-rate caps therein exceed those in Section 1831d(a) and are applied to loans that are not "made in" Colorado. Consistent with the statutory interpretation outlined above, the State may only opt-out of Section 1831d for loans made by lenders in Colorado. It may not apply its UCCC to loans made to Colorado residents otherwise.

Injunctive relief also should generally be limited to the parties before the court. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("When a district court orders the government not to enforce a rule against the plaintiffs in the case before it, the court redresses the injury that gives rise to its jurisdiction in the first place. But when a court goes further than that, ordering the government to take (or not take) some action with respect to those who are strangers to the suit . . . . [that] raise[s] serious questions about the scope of courts' equitable powers under Article III."). That is a bit complicated here, because it is the plaintiffs' members, not the plaintiffs themselves, who would be harmed by enforcement of the preempted interest rates. "[A]ssociational standing creates a mismatch: Although the association is the plaintiff in the suit, it has no injury to redress. The party who needs the remedy—the injured member—is not before the

court." *FDA v. Alliance for Hippocratic Med.*, Nos. 23-235, 23-236, 602 U.S. —, slip op. at 5 (U.S. June 13, 2024) (Thomas, J., concurring) (questioning current organizational standing doctrine that gives associations standing based on their members' injuries rather than their own). The Supreme Court's associational standing doctrine, though, has been "consistently applied," *id.* at 9, and is not challenged here, so the injunction will prohibit the State from enforcing the preempted interest rates against the plaintiffs' members.

### B.  Security

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The parties have not briefed this issue. In the Tenth Circuit, district courts have "wide discretion" in determining whether to require security. *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003). Where there is "an absence of proof showing a likelihood of harm" to the enjoined party, waiving security is permissible. *See id.* The State has not suggested that an injunction would cause it any monetary damages, nor has it requested any security. Given the current record, therefore, I find it appropriate to waive the security requirement in this case.

### CONCLUSION

It is **ORDERED** that:

Plaintiffs' Motion for Preliminary Injunction, **Doc. 24**, is **GRANTED**;

Pending a final determination of the plaintiffs' claims on the merits, the defendants, their officers, agents, servants, employees, attorneys, and any others who are in active concert or participation with them are

**PRELIMINARILY ENJOINED** from enforcing the interest rates in the Colorado Uniform Consumer Credit Code with respect to any loan made by the plaintiffs' members, to the extent that (a) the applicable interest rate in 12 U.S.C. § 1831d(a) exceeds the rate that would be permitted in the absence of that subsection, and (b) the loan is not "made in" Colorado within the meaning of the Effective Date note to 12 U.S.C. § 1831d as explained above; the State may only apply its UCCC interest rates to loans made by lenders in Colorado, regardless of the location or residence of the borrower.

DATED: June 18, 2024                    BY THE COURT:

~~Daniel D. Domenico~~
United States District Judge